which is United States against Coscia. Ms. Hutchinson. Good morning, your honor. I apologize for feedback. Ms. Hutchinson, there's obviously feedback on your end. You might have multiple microphones live. We do. My colleague and I are separating from one another right now. Thank you, your honor. Jill Hutchinson for Michael Coscia. Beginning with the denial of Mr. Coscia's Rule 33 motion about newly discovered evidence, I recognize the court's familiar with some of the granular details in this case, both from the briefing and from the prior direct appeal. So I'd like to briefly address the materiality issue of new evidence in connection with that Rule 33 motion before handing the floor to Mr. Campbell to address the Section 2255 issues. What we have here from a 30,000-foot view is new evidence not provided before trial that boils down to a wealth of underlying data, data about other traders in the ICE and CME markets. I'm going to stop you immediately, if I might, Ms. Hutchinson. If we start from the premise that the key aspect of Mr. Coscia's trading strategy was the cancellation of large orders after a small trade was filled, then what does the newly discovered evidence tell us that the jury did not know at trial? What I believe the jury did not know at trial is that cancellations are a much more common part of trading practice than I think the evidence showed at trial. A very significant portion, I believe upwards of 90 percent, one individual noted, are canceled. And in fact, when we get the data that shows what percentage of large orders are canceled by other traders, we see that many more large orders are also canceled by those same traders. So it seems to be a part of their strategies as well. But that doesn't mean that, in fact, an individual intended to cancel those simply is the fact that the vast majority of them are canceled by all individuals involved in these markets. Well, look, for example, it doesn't seem to me that the error in summary chart number six was particularly meaningful if we focus on the large orders that were canceled after a small trade. Well, to be honest, Your Honor, is quite questionable. You know, at this point, we still don't actually have the underlying ICE data to be able to verify that it wasn't 96 percent. It's 91 percent as ICE agreed after trial. We can't verify that even that is accurate. And in fact, it seems suspicious that we have this narrow pool of data that's forming the corpus of that conclusion because that conclusion wasn't based on the full breadth of ICE's data. Rather, it was merely a small subset of transactions that popped up within an ICE trading tool to identify what they believed were suspicious transactions. So I think the important question is to look at the full set of data so that we can actually get the accurate number. That's data Mr. Casillas still does not have. And so, Your Honor, to me, the materiality of this evidence is that it goes not only to the fact that we have known errors in these charts, this evidence also would have allowed Mr. Casillas to buttress his own conclusions. When we boil down this data that he didn't have before trial, we see that he actually fills a greater percentage of large orders on many of these markets than any other trader. So while he may make and cancel more trades, he's also filling more trades. That's an important piece of context that the jury didn't receive. But again, Mr. Casillas was unable to do this type of analysis because he didn't have the underlying data. All he got were these summary conclusions and statistics. He had his own trading data, but you can't make a comparison with just your own data. And so, in many ways, this is similar to situations like United States versus Hernandez-Rodriguez, where the district court looked very narrowly at the question of whether the facts in that case was actually relevant to this case. But in actuality, if they'd looked at the full breadth of what was coming in with the new affidavit, they would have realized that it buttressed many of the points that the defendant appellant was attempting to make during his own case to show that he, in fact, was not involved in this conspiracy. He didn't know the individuals involved. And likewise here, I believe the district court underneath looked at this too narrowly. They looked at this as trying to pick off individual pieces of data on the side of the government that were put forth at trial. But in actuality, it goes to both Mr. Casillas' defense and the government's case that it put forward. And it was an abuse of discretion in Hernandez-Rodriguez to focus so narrowly on merely the fact that it pointed out that the government's evidence was incorrect. Well, you know, there was other evidence bearing on Mr. Casillas' intent, including the testimony of Mr. Bessembinder, Mr. Parks. How, if at all, does the new evidence cast their testimony in a different light? Well, it cast Mr. Bessembinder's testimony in a different light because he acknowledged that he did not, in fact, have this underlying data. So he didn't come in with the perspective of knowing what other traders were, in fact, doing within the market and how Mr. Casillas compared to them. And when that data comes forward and can be used affirmatively, it paints him in a different light.  presentation of the testimony. You know, has that been called into question as the government has proceeded against other traders and backed away somewhat from the contention that this was designed and intended to pull the large orders with intent to cancel every order when it was made? In fact, we know these orders were capable of being filled at that time. And, Your Honor, at this time— Mr. Campbell. Good morning to the court and counsel. May it please the court. I'm here to address the issues raised in the 2255 case. This is an extremely unusual case, factually. Mr. Kossia's defense lawyers at his criminal trial also represented several entities that the government claimed were victims of his offense and whose high-ranking representatives were the central witnesses in the government's case. Yet those conflicts were never disclosed to Mr. Kossia, were never disclosed to the court, were never vetted in any way, and there was certainly no knowing waiver of those conflicts. The facts relating to the conflicts of interest are largely undisputed, at least the ones that we currently know about. Those include that Sullivan and Cromwell, the firm that represented Mr. Kossia at trial, had an over a decade-long attorney-client relationship with the Intercontinental Exchange, what we refer to as ICE, including, quite surprisingly, that they were—Sullivan and Cromwell was representing ICE on a $5 billion deal that closed the same day Mr. Kossia's trial started. Even more shocking is that one of the Sullivan and Cromwell lawyers who had represented ICE in a variety of matters over a decade was Mr. Kossia's lead lawyer, and in fact he was the lawyer who cross-examined the ICE witness, Mr. Redman, at trial. He is the same lawyer who failed to demand, failed to obtain the data underlying the ICE charts, and the Intercontinental Exchange was not the only conflict that Sullivan and Cromwell brought to this case. We produced evidence in the 2255 below showing that Sullivan and Cromwell also represented two other entities whose high-ranking representatives were central witnesses for the and Citadel. There is, I think, no doubt that this is a case of concurrent representation. Sullivan and Cromwell was concurrently representing ICE and D.E. Shaw at the time of Mr. Kossia's trial. Under Kyler v. Sullivan, the showings that are needed are an actual conflict, which I don't think can seriously be disputed under the facts presented. And secondly, and excuse me, I believe we lost Judge Roedner. Okay, we're going to try and get it reconnected. I apologize. That's okay. Okay. Judge Roedner, can you hear me? I have not heard you for about three minutes. We stopped it. My computer went off. I apologize. Okay. Okay. Should be working now. Can you speak? Yes. Can you hear me, Judge? Yes. Okay. Judge Roedner, this is Terry Campbell. So I am the attorney arguing the 2255. Right. I heard about, I heard you for about two minutes in. Okay. So I'll back up a little bit and try and cover some of that ground quickly. And obviously, if you have any questions or feel like I started where before you left off, let me know. The short fact of the matter is that there was a conflict of interest because Sullivan and Cromwell had concurrent representation of the Intercontinental Exchange, among others, of the entities whose high-level representatives were central witnesses for the prosecution in this case. This is a case of concurrent representation because the law firm, Sullivan and Cromwell, is the relevant entity. And that's made clear both under the case law and the ethical rules that require firms to avoid conflicts, not individual lawyers. But even if it was the individual lawyer who was the pertinent issue, Mr. Reisler, Mr. Kassia's lead trial counsel, had a decade-long relationship where he had represented ICE on multiple matters. And those are the only the things that we know about based on our research of the public record. When we asked, when Mr. Kassia's attorneys asked Sullivan and Cromwell to identify whether or not they had represented others of the, you know, 20-plus entities who were involved in the case, Sullivan and Cromwell responded by simply saying, we can confirm that Sullivan and Cromwell represented certain entities listed in your letter prior to or during Sullivan and Cromwell's misrepresentation of Mr. Kassia. So we have, I think, undisputedly an actual conflict here. Under Kyler versus Sullivan, what we need to show is the actual conflict and then an adverse effect. And of course, the adverse effect is very different from what is required under Strickland. The Kyler standard, very intentionally, is a lesser standard than what is required to show Strickland prejudice. An adverse effect merely requires a showing that the lawyer did or didn't do something because of the fact that they represented the other client as well. We have listed a number of concrete adverse effects in this case. I'll tick off a few for reference here. But one is that council failed to get the data underlying the ICE summary charts, which were obviously critical evidence against Kassia. As Ms. Hutchison said, we don't even have that data today. But they didn't even do the most fundamental thing, which is to get the data underlying summary charts that the government was offering. And there is no doubt that the summary charts were critical evidence. The district court agreed to that or stated that. The government stated that below. And I believe this court cited some of those summary charts in affirming the conviction on direct appeal. There was a failure to investigate those ICE charts. There was testimony from the ICE witness, Mr. Redman, that Mr. Kassia, on a particular day in a series of transactions, had lost $122,000 on a large trade. And we now know that, in fact, that those losses came from a series of small trades. And that is not insignificant. That piece of testimony was used by the government to argue that clearly he didn't want to have his large orders filled because this is what happens. He loses a bunch of money when those large orders are filled. The testimony was inaccurate in the extreme, and it was used as a cudgel against Mr. Kassia. They failed to... If we presume that there were shared confidences among Sullivan and Cromwell attorneys, what sort of knowledge would Raessler have acquired from ICE that would have posed a conflict with Mr. Kassia's defense? In other words, look, how plausible is it that Sullivan and Cromwell attorneys, including Mr. Raessler, would have learned something confidential from the various regulatory and transactional matters that would have been material to Mr. Kassia's defense? So the answer, in part, is we don't know. We don't know all of the subject matters that Sullivan and Cromwell represented ICE on. But it was not only transactional matters and regulatory matters, but also litigation matters. And so you can think of a whole host of things that they may have learned from their trade works, what their view is towards trading programs like these. And more importantly, I think, in this context is Sullivan and Cromwell had a long-term and no doubt highly lucrative relationship with ICE. And so the question, I think, that's more probative of whether there was an adverse effect is, did they pull punches? Did they not push ICE on certain things that they would have otherwise? Including... Campbell, you seem to be suggesting, as did your colleague, that perhaps you and we don't have all of the information we need. Are you really arguing that we should send this back to the district court with directions to conduct a hearing? So your honor, I think that's the minimum that's required. But I will tell you, I think there is plenty of evidence in the record right now for the court to make a decision on the merits of this. The ICE conflict is not the only one. And so you have the conflict with D.E. Shaw and Citadel. One of the central arguments that the government made at trial was that Mr. Cassius trading was unique, that he was an outlier, that nobody else was doing this. Citadel and D.E. Shaw are trading firms that have these high-frequency trading algorithmic programs. And nobody from Sullivan and Cromwell said, hey, I want to know what other people are doing. It is a piece of information that would have been critical to showing good faith. If other people are doing the same things, it would have buttressed Mr. Cassius' claim that I was acting in good faith. I'm doing what everyone, or at least a lot of other people, believed was information. How many of those others were also investigated, indicted, tried? Of the other traders? I don't have information on other of the firms involved being prosecuted for spooking. You don't have it, or it does, or you? I don't know as I sit here whether any of the other firms that, if you're asking about the firms that were mentioned in Mr. Cassius' trial, whether any of them were indicted for spooking, I don't know the answer to that. I don't know one way or the other. I do know this, Your Honor, as far as the about. One of the things that you can look to that's very concrete evidence here is they sought and subpoenaed information about trading firms that were not their former clients or current clients. They did not seek that information about the entities that were their current clients. We have cited Record 5, Item 20, which is a subpoena that was issued. You can see in that and traders who were not their clients and specifically omitted to ask for those types of data with respect to the entities who are their clients, D.E. Shaw and Citadel. I think that there is plainly sufficient information in the record now to make the finding under Kyler v. Sullivan. As I said, I don't think anyone sitting here can seriously dispute that there was an actual conflict. As far as an adverse effect, we've listed six or seven of them that are concrete. I started going through those before, but those things are not going to change. We know that there were things that counsel did not do that any counsel would have done if they were going to investigate the case. Get the data underlying the summary charts. Find out what other trading firms did. Treat other entities the same as you treat your other current or former clients. They simply did not do that in this case. I believe that we have sufficient information in this record for the court to make a finding that he has satisfied his burden under Kyler v. Sullivan. A word to be sent back. What specific questions would you expect Judge Leinan Weber to ask in order to satisfy himself that there was no conflict that would burden Mr. Reisler in representing Mr. Kezia? Judge Leinan Weber has already found there was a conflict that burdened Mr. Reisler. And so there can only be more information to confirm his finding on that point. He was very clear. What specific questions should a judge be asking? Number one, I think the relevant inquiry is about Sullivan and Cromwell, not Mr. Reisler, but there are questions that cover both of them. What are all the representations that Sullivan and Cromwell had with ICE, with D.E. Shaw, and with Citadel? What were the subject matters of all of those representations? When did they occur? Did Mr. Reisler have any financial interest in the monies that were received on any of those engagements? Did he have any involvement in any of those engagements? Was he the partner who was responsible for bringing ICE into the firm as a client? We need to know the details of what that relationship was, and we haven't heard anything from Sullivan and Cromwell. The evidence that we have, which is substantial, is all things that we were able to find in the public realm, but we don't know. The list of a dozen or so matters that we know Sullivan and Cromwell and Mr. Reisler personally were involved in may be just scratching the surface. Couldn't you have found all of that out before the first trial? So, Judge, the attorneys have an obligation under the ethical rules to identify conflicts. Large law firms have departments that are devoted to vetting conflicts before a client is taken. The lawyers have an obligation to identify to the client, here is a conflict, and put it on the record. Every one of us here has been in a courtroom where that's happened. It is routine, and it is inexplicable that counsel didn't raise this with Mr. Cassia and put it on the record and have Mr. Cassia either waive or not waive the conflict, but the rules and the law require a knowing and intelligent waiver if there is to be one when there is a conflict. Every law firm identifies conflicts, and it is routine in criminal cases for a lawyer to identify those in open court. It's really required. Mr. Campbell, you suggest in your brief that trial defense counsel treated the entities with whom his law firm had a relationship somewhat differently than other potential witnesses in terms of getting background material. Could you elaborate on that a little bit? How was he different? So, I'll give you two examples. One, Your Honor, is what we've talked about before, not even asking for. Not even asking for, well, they asked for it and then didn't actually pursue getting the data underlying the ICE summary charts, and those summary charts were central pieces of evidence. So, ICE is a current client of Sullivan and Cromwell. Sullivan and Cromwell is closing on a $5 billion deal for them the same day the trial starts. They did not even seek the underlying data for those summary charts. The second example of disparate treatment between non-client government witnesses and client government witnesses is what I referred to a little bit earlier, which is the subpoena that was issued to the CME, where they asked for all the relevant trading data related to certain traders of firms who were not their clients, but specifically omit asking for that same data with respect to the traders from D.E. Shaw and Citadel. The record site on that is record 5, number 20, Exhibit 19 at pages 5 through 9. It's the subpoena and you can look at it and you will see the disparate treatment of what records they asked for between clients and non-clients in identical situations. So, those are the two primary examples of the disparate treatment. Thank you, Mr. Campbell. Thank you, Judge. Ms. Alexakis. May it please the court. My name is Georgia Alexakis and I represent the United States. The district court properly denied defendant section 2255 petition based on his claim of ineffective assistance of counsel. And I want to pick up where Mr. Campbell left off with respect to the alleged adverse effect of the purported conflict for trial counsel on trial day. Counsel's performance. And in particular, both Mr. Campbell and Ms. Hutchinson have advanced this argument that trial counsel did not obtain the underlying data that underlies the ICE summary chart. But in fact, the defendant's expert testified at trial and the court confined this testimony at transcript 1211 and 1212, testified that he received 700 million rows of data, the equivalent of 14 million pages of data from CME and ICE. And then he goes on to say that he used that data to quote benchmark. Those are his words. He used that data to benchmark Mr. Kasha's trading activities relative to the activities of other traders. In the course of Mr. Evans' testimony, trial counsel then admits six summary charts, defense exhibits 521 through 527, in which Mr. Evans does exactly what he said that he would do, benchmark Mr. Kasha's trading activities relative to other traders. And even more tellingly, I'd like to direct the court's attention to defense exhibit 525, which Mr. Evans discusses at trial transcript 1235 through 1237. Defense exhibit 525 is defense's version of ICE summary chart 3. So ICE summary chart 3 was presented through ICE witness Redmond. Redmond testified that Mr. Kasha's order to trade size ratio on the ICE Brent market was 1,592%. Mr. Redmond was crossed on that chart during his also testified on ICE summary chart 3. And he testified that there was data that had appeared on an earlier version of summary chart 3 that Mr. Redmond removed prior to trial. And trial counsel made this point again during closing. Mr. Redmond removed data that if added to ICE summary chart 3 would present a different picture of the defendant's trading activities. So Mr. Evans, defense expert, did add that data to his version of ICE summary chart 3. And that's what is defense exhibit 525. And I think that testimony presents a picture that refused this idea that Mr. Kasha did not have access to the underlying data and that his trial counsel somehow because but for a conflict would have obtained the data. They have the data. The only data that they did not have as the government conceded post-trial was a subset of data underlying ICE summary chart 6. The government recognized that that was an error, conceded that it was an error, promptly produced that data to the defendant. This notion that the defendant. I think I have somewhat of a handle on how summary chart 6 would have looked in light of the newly discovered evidence. The difference is a modest one. If the appropriate focus is indeed the cancellation of large orders following a small trade. And what you are now saying about summary chart 3 is I think that the impact on that chart would have been equally as modest as it was on 6, if at all. I think if at all. I apologize, Judge. I'm sorry. Why don't you finish your question? Are you saying that the impact on all of the other summary charts would have been equally as modest as on 6 and what you seem to be saying about 3? Judge, I'm saying that the impact on 6 is modest. I think your understanding is correct that it was a difference of 96% versus 91% when looking at large order cancellations following small order trade. With respect to ICE summary chart 3, I'm not saying that there were any errors and I'm not saying that there were any errors with respect to any other of the summary charts presented, either ICE or CME. My point with respect to ICE summary chart 3 is that I think Mr. Evans' testimony, the defense expert's testimony on that chart, belies the notion that defendant did not have access to the underlying data. It also belies the notion that defense counsel somehow, I think Mr. Campbell called it pulled punches, that somehow defense counsel pulled punches with respect to the ICE witness when, in fact, not only did they cross-examine the ICE witness on the ICE summary charts, but they then used their own defense expert to attack one of those charts and to produce their own version of that chart. And then in closing argument, Mr. Kasha's counsel, Karen Seymour, attacked again ICE 3, but then also attacked ICE 6 and talked about how ICE 6 showed that other traders were beginning to mimic Mr. Kasha, that they were, after a period of time, were beginning to adopt the same trading strategy as him. So that's at transcript 1539. So there's an overarching argument in both appeals that defense counsel performed efficiently, that they performed adversely, either because of straight and effective assistance of counsel or owing to a conflict, when, in fact, what they did is advance a two-pronged defense strategy. They argued first and foremost that the defendant acted in good faith, that he traded as he did, that they weren't going to dispute the trading activities, but they denied the illegality. And they advanced that it's a repeated theme. Different is not illegal. But then they also advanced a two-pronged, the second part of their strategy, I think, addresses arguments made both by Mr. Campbell and Ms. Hutchinson that trial counsel pulled punches, when, in fact, they retained their own expert who testified that he reviewed 700 million rows of data, that he did that analysis in order to, quote, benchmark the defendant's trading activities relative to other traders. And then they produced and showed the jury their own summary charts that compared Mr. Kasha's trading activities relative to the other traders. And Mr. Evans goes on to testify about how Mr. Kasha traded or filled fewer large orders than other traders, that he canceled them at a, I'm sorry, that he filled more large orders than other traders, and that he canceled his large orders at a lesser rate than other traders. So they did, defense counsel, Mr. Kasha's trial counsel did exactly what defendant now on appeal is claiming they did not do. And based on that, there can be no argument that even assuming a conflict, that there was an adverse effect on their performance, or that Mr. Kasha was somehow prejudiced by their performance. How do you respond to the suggestion in Mr. Kasha's briefs that his trial defense counsel, in fact, treated the clients of the firm somewhat differently than the other sources of information? Sure, Judge. And I'd like to take that entity by entity because I think the analysis differs a little bit. With respect to ICE, I don't think that there is an argument that ICE was treated differently than the other exchange, CME. The ICE charts were admitted with no objection. The CME charts were also admitted with no objection. To the extent that the defendant is arguing that he didn't receive certain data from ICE or that his defense counsel didn't pursue that data from ICE, the post-trial record indicates that he felt the same way about CME because he subpoenaed CME as well after his trial seeking additional data. He cross-examined the ICE witness on three of the summary charts, the CME with three of the six summary charts. The CME witness was cross-examined on four of the six summary charts. I think as between ICE and CME, there isn't a credible claim that those two exchanges were and therefore defendant cannot establish the relative, cannot satisfy the standard under Kyler that but for a conflict, his trial counsel would have acted different. With respect to DE Shaw and Citadel, I think it's important to keep in mind that there is no allegation here that Sullivan and Cromwell concurrently represented those two entities. In the district court, at best, defense counsel argued that Sullivan and Cromwell represented DE and Citadel in 2009 in corporate and transactional matters. So this is a different test than a concurrent representation test. Under a prior representation test, the defendant needs to establish that there was a substantial relationship between those prior representations and his current case. And he also needs to establish that his trial counsel received confidential information relevant to his case in those prior cases. So back in 2009, before the spoofing statute was even enacted by Congress, he would have to show that counsel for Sullivan and Cromwell received relevant information from DE Shaw and Citadel with respect to trading activity that he did not engage in until 2011, with respect to charges that were not brought until 2015. So that speaks to, I think, a lack of conflict with respect to DE Shaw and Citadel. And as for the- In his reply brief, Mr. Kosia outlines how his counsel treated witnesses from Citadel and DE Shaw differently in terms of requesting trading records. Should that give us pause now that we know what connections Sullivan and Cromwell had to those firms? I don't think so, Judge. In part because with respect to DE Shaw and Citadel, I don't think that a defendant has established an actual conflict. But again, even assuming a conflict, I don't think that conflict had an adverse effect on their performance. Mr. Kosia argues in his reply brief that DE Shaw and Citadel were- that those entities, the defense counsel did not subpoena for trading data related to those entities. And it is true that with respect to the subpoena that he directly cited in that reply brief, Citadel and DE Shaw are not mentioned. And yet in a different subpoena to CME, defendant did ask for data related to DE Shaw and Citadel. And the court can find that at R227 at Exhibit 3. In addition, defendant argues that with respect to trading data, the trial counsel subpoenaed for records from a number of traders. And I will mispronounce their names, but one trader, for example, was Roomba. And there are two other traders, I apologize, I forget their names off the top of my head. And that, you know, he draws a comparison that the subpoena trial counsel subpoenaed records for those three traders, but not for Citadel and DE Shaw. What defendant leaves out is that there was one other trader, Hovhannes Dermenchian from TESA Trading Technologies, that also does not appear on that subpoena. So, you have three traders that for which trading data was subpoenaed. You have DE Shaw and Citadel for which some trading data was subpoenaed, and there's the allegation of a conflict, a purported conflict there. And then you have a whole other trader, Mr. Dermenchian of TESA, where there is no allegation of a conflict and where there was no subpoena for his trading data, or at least not at the same time that defense counsel is alleging that the other three trading entities, their trading data was requested. And so, it cannot again be that there was an adverse effect for purposes of Kyler, where another trader for whom there is no allegation of a conflict was treated the same way as DE Shaw and Citadel. Defendant cannot establish the trial counsel would have otherwise acted differently. It's the same question that I asked Mr. Campbell. Are you aware if any of the other traders accused of the same behavior were investigated, indicted, tried, et cetera? I think the record reflects that there were other traders after Mr. Kasha who were indicted for similar conduct. I don't know, but I do not believe, Judge Rovner, that the record reflects that those traders were the same traders who testified, the same trading entities that testified at Mr. Kasha's trial. I actually missed your first sentence. I'm sorry. Did you say there were? I think there were others. The record reflects, and I think this is part of the Defendant's Rules 33-related appeal, that there are other traders who, subsequent to Mr. Kasha, were in charge with similar conduct. I do not believe that the record reflects that those traders are traders who testified at Mr. Kasha's trial. I would like to touch on a few additional points with respect to the argument that trial counsel performed adversely because they did not cross examine Mr. Redmond with respect to his testimony that the Defendant lost $122,000 in some change based on a large order loss. The argument that's been advanced is that, in fact, that loss was related to a small order, a series of small order trades, and that trial counsel performed adversely by not correcting that. I believe strongly that this was a strategic decision on the part of trial counsel, that it fit into their good faith defense argument, and it fit into the Defendant's trial testimony, that he treated large orders and small orders in the same way, that he was, quote, indifferent to them, and that this was an argument that was advanced again in closing. Ms. Seymour, Defendant's trial counsel, argued that Defendant, you know, sometimes he loses money on his large orders, and so it was to, there was a strategic call there to be made, which is to say that leaving Mr. Redmond's testimony untouched allowed the jury to understand that there was, in fact, a time, at least one time, that Mr. Kasha allowed a large order trade to go through, and that, sure, he lost money, but again, that wouldn't have surprised him because he was that's simply the nature of the trading world, the trading business. That's how it works. With respect to the Rule 33 motion for a new trial, I want to touch upon the prejudice argument. There was, there have been arguments about, related to Mr. Park's testimony and Professor Bessenbinder's testimony, and so setting aside the attacks on the summary charts, which the even if there was some merit to them, Park's testimony and Bessenbinder's testimony, in and of themselves, provided sufficient evidence to establish that Mr. Kasha acted intentionally, that when he placed those large orders, he intended to cancel them. Mr. Park testified that Mr. Kasha told him that he wanted him to design the programs in such a way as to, quote, act as a decoy, that the large orders would act like a decoy, that they would be used to pump the market, and the government. Do you think the problem here is that, as the court pointed out, Mr. Kasha's evidence compared all trade cancellations, no matter the reason, no matter the size, whereas the government's trial statistics were based on the cancellation of large trade orders following the execution of small trades? In other words, there's a that they are comparing apples to oranges with the post-trial data, and I think that the jury understood exactly what ICE Summary Chart 6 was supposed to represent, large order cancellations following the small order trade. That's what Mr. Redman testified to, that's how the government characterized ICE Summary Chart 6 in its closing, and in fact, that's how Defendant's own trial counsel characterized ICE Summary Chart 6 in her closing argument. So with that, judges, unless there are any additional questions, the government would ask that this court affirm the district court's denial of the defendant's Rule 33 motion for a new trial, and also affirm the district court's denial of the petitioner's Section 2255 petition based on an ineffective assistance of the district court. Judges, I just want to hit three points very quickly. One is the question about whether or not the underlying data was received. Counsel, your time has expired. This case is taken under advisement. The court will hear argument now in the case.